**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**GLOREE SAPIO,**

                                                    **Plaintiff/Counter**
                                                    **Defendant,**

          **vs.**                                                    **1:19-CV-11**
                                                                      **(MAD/CFH)**

**SELUX CORPORATION, YVONNE RIVERA,**
**and ED WOLF,**

                                                    **Defendants/Counter**
                                                    **Claimants.**

_____

**APPEARANCES:**                              **OF COUNSEL:**

**RYANNE KONAN LAW FIRM**                      **RYANNE G. KONAN, ESQ.**
4 Marshall Road, Suite 248
Wappingers Falls, New York 12590
Attorney for Plaintiff/Counter Defendant

**BOND, SCHOENECK & KING, PLLC**               **ROBERT F. MANFREDO, ESQ.**
22 Corporate Woods Boulevard, Suite 501
Albany, New York 12211
Attorney for Defendants/Counter Claimants

**Mae A. D'Agostino, U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I. INTRODUCTION**

        Plaintiff Gloree Sapio initiated this action on January 4, 2019, through the filing of a

complaint. _See_ Dkt. No. 1. She filed an amended complaint on August 21, 2019, alleging that

her previous employer Defendant Selux Corporation ("Selux") and two of its employees,

Defendants Yvonne Rivera and Ed Wolf, (collectively, "Defendants"), discriminated against her

because of her race and fraudulently induced her to sign a Separation Agreement, all in violation of 42 U.S.C. § 1981[1] and New York State Human Rights Law § 296.  *See* Dkt. No. 20.

In September 2019, Defendants moved to dismiss Plaintiff's amended complaint, *see* Dkt. No. 23, which Senior Judge Gary L. Sharpe granted for failure to state a race discrimination claim.  *See* Dkt. No. 26.  Plaintiff appealed and the Second Circuit vacated and remanded the Court's decision.  *See* Dkt. No. 28; *see also Sapio v. Selux Corp.*, 844 Fed. Appx. 456, 457 (2d Cir. 2021).  Following the remand from the Second Circuit, the parties filed supplemental briefing on Defendants' motion to dismiss concerning the tender-back doctrine.  *See* Dkt. Nos. 36, 37. Judge Sharpe then issued a Summary Order denying the motion to dismiss.  *See* Dkt. No. 38 at 2; *see also Sapio v. Selux Corp.*, No. 1:19-CV-11, 2021 WL 4844274, *1 (N.D.N.Y. Oct. 18, 2021). Defendants subsequently answered Plaintiff's amended complaint and filed a counter claim for breach of contract.  *See* Dkt. No. 39.

Presently before the Court is Defendants' motion for summary judgment on all of Plaintiff's claims and their counter claim.  *See* Dkt. No. 60.  Plaintiff responded in opposition, *see* Dkt. Nos. 63, 64, 65, and Defendants replied.  *See* Dkt. No. 66.  For the following reasons, Defendants' motion is granted.

## II. BACKGROUND

Selux is a manufacturing company located in Highland, New York that produces high-end architectural light fixtures for office buildings and campuses.  *See* Dkt. No. 64 at ¶¶ 1-2.  Selux's

---

[1] Plaintiff's amended complaint references 42 U.S.C. § 1983.  *See* Dkt. No. 20 at ¶ 2.  She does not, however, set forth a cause of action for such a claim.  *See id.* at ¶¶ 23-88.  Defendants contend that Plaintiff's reference to section 1983 was a typographical error.  *See* Dkt. No. 60-2 at ¶ 80 n.6.  Plaintiff does not address this in any of her filings.  *See* Dkt. Nos. 63, 64, 65.  Rather, in her memorandum of law, she lists only § 1981, section 296, and common law fraud as her claims that are before the Court.  *See* Dkt. No. 65 at 4.

parent company, Selux GMBH, is located in Germany. *See id.* at ¶ 1.  Peter Stanway has been

Selux's Chief Executive Officer ("CEO") since 2013. *See id.* at ¶ 3.  Stanway is responsible for

hiring and firing senior-level employees. *See id.*  Defendant Rivera was hired as a Human

Resources Generalist for Selux in 2011 and was promoted to Human Resources Manager in 2016.

*See id.* at ¶ 4.  Rivera resigned in July 2022. *See id.*  Defendant Wolf was a Controller at Selux

from 2007 until his retirement in February 2021. *See id.* at ¶ 5.  Wolf supervised the Human

Resources Department when Plaintiff was terminated. *See id.*

Plaintiff is Asian, from the Philippines, and a United States citizen. *See id.* at ¶ 7.

Plaintiff received her associate degree in business administration from Dutchess Community

College in 2006 and she completed one semester at Hunter College. *See id.* at ¶ 9.  In 2006,

Plaintiff worked as an administrative assistant to the senior vice president and vice president for

Starwood Hotels in White Plains, New York, and then as an administrative assistant to the

divisional vice president of Jim Beam in Rye, New York. *See id.* at ¶¶ 10-11.  Simultaneously,

Plaintiff worked part-time at the front desk of a real estate company. *See id.* at ¶ 13.

Plaintiff was hired by Selux in July 2011 as an Executive Assistant reporting to Claus

Kinder who was the Vice President of Operations and Engineering. *See id.* at ¶ 14.  Her position

was salaried and exempt. *See id.* at ¶ 16.  Veit Mueller, the Chief Executive Officer at the time,

and Kinder, interviewed Plaintiff for her position. *See id.* at ¶ 15.  Kinder hired Plaintiff. *See id.*

Kinder then resigned as Vice President of Operations and Engineering in 2012. *See id.* at ¶ 17.

From 2012 to 2014, Plaintiff supported Engineering Managers Stanley Mayer and Robert

Vandermulen, who oversaw quality assurance. *See id.* at ¶ 18.

In 2014, Selux hired Michael Seckler as Vice President of Manufacturing at which time

Plaintiff was assigned to support him as his Executive Assistance. *See* Dkt. No. 60-2 at ¶ 19.  As

3

reflected in Selux's employee organization chart, Seckler was Plaintiff's direct supervisor. *See id.* at ¶¶ 19-20; *see also* Dkt. No. 60-17.  Seckler completed Plaintiff's performance reviews. *See* Dkt. No. 64 at ¶ 21.  Plaintiff's workstation was directly outside of Seckler's office. *See* Dkt. No. 60-2 at ¶ 22.  In 2014, while Plaintiff was supporting Seckler, she was also supporting Mayer as the Engineering Manager. *See* Dkt. No. 64 at ¶ 19.  On February 13, 2017, Selux re-hired Kinder as Director of Engineering Solutions. *See* Dkt. No. 64 at ¶ 23.  Kinder's position was a non-executive level position. *See* Dkt. No. 60-2 at ¶ 24.  Rivera testified that Kinder's office was across from Plaintiff's office. *See* Dkt. No. 60-9 at 17.  Plaintiff supported Kinder, but Kinder did not have an executive assistant and Plaintiff did not report directly to Kinder. *See* Dkt. No. 60-2 at ¶¶ 20, 24-25; Dkt. No. 64 at ¶¶ 24-25.

Defendants explain and Plaintiff agrees, that "[t]he engineering department's role in the company is to create designs, create builds and materials, create routers to have the designs built, test, and submit for a UL approval—ensuring that the products meet regulatory requirements and are safe."  Dkt. No. 64 at ¶ 26.  "The manufacturing department's role is to take the drawing designs and build the materials and fixtures to conform to the drawing designs." *Id.* at ¶ 27. "There is a daily meeting that takes place with lead employees from the shop floor, purchasing, engineering, and manufacturing.  The purpose of the daily meetings is to assess the needs of the respective departments to determine what needs to be done to meet production goals, shipment, and delivery timelines." *Id.* at ¶ 28.  As part of the daily meeting, Defendants contend that "Plaintiff's role . . . was to interface with the engineering group to determine what the status was of a custom design and whether it was complete.  She participated in these meetings as a representative of Seckler."  Dkt. No. 60-2 at ¶ 29.  Plaintiff asserts that she was in the meetings on behalf of both the Engineering and Manufacturing Departments because she had "to make sure

clients' deadlines were met" and she created a spreadsheet for both Departments.  Dkt. No. 64 at ¶ 29.  Plaintiff contends that Kinder "needed an assistant at the meeting, because Janine Dunham was present at the meeting when she was hired."  *Id.*

Defendants agree that "[b]ecause of the close working relationship between the manufacturing and engineering departments, there may have been occasional support offered by Plaintiff to Kinder and others in the engineering department, but that was not her primary assignment. . . .  [S]he served as a liaison between Seckler and the engineering department."  Dkt. No. 60-2 at ¶ 30.  Plaintiff "denie[s]" this fact but agrees that she supported Kinder only part-time.  Dkt. No. 64 at ¶ 30.  Plaintiff alleges that she was verbally told she would support Kinder as well as Seckler.  *See id.* at ¶ 31.

Around February 2014, CEO Stanway was assisting the Engineering Department with its work while the Engineering Manager was on vacation.  *See* Dkt. No. 60-2 at ¶ 33.  Stanway asked Plaintiff to assist with a clerical task and Plaintiff asked why she needed to do the task.  *See id.* The interaction was noted in an Employee Conversation dated February 4, 2014, and the Engineering Manager later spoke with Plaintiff about her uncooperativeness.  *See id.*; *see also* Dkt. No. 60-24.  Plaintiff "denie[s]" this allegation, asserting that despite the February incident with Stanway, she "was not reprimanded for those complaints, and Plaintiff still met her expectations.  Stanway did not even remember those incidents and was satisfied with Plaintiff's performance."  Dkt. No. 64 at ¶ 33.  In June 2014, Plaintiff was counseled by Selux's Vice President Brenda Shaffer about the inappropriate and disrespectful nature of an e-mail that Plaintiff sent to the "quotes" group.  Dkt. No. 60-25; *see also* Dkt. No. 60-2 at ¶ 34.  In response to this allegation, Plaintiff notes that she "was asked to speak to the engineering [department] to clarify her intentions.  Plaintiff was not reprimanded. . . .  Plaintiff was terminated in 2018.  And

would not have been working for another four year [sic] if the incident was serious."  Dkt. No. 64 at ¶ 34.

In April 2017, Kinder asked Rivera for assistance after four members of the Engineering team expressed concerns about Plaintiff's attitude toward them.  *See* Dkt. No. 60-2 at ¶ 35. Kinder had previously discussed these concerns with Seckler.  *See id.*  Plaintiff does not deny that any of these conversations occurred, but instead argues that "Kinder only complained because he did not like Plaintiff.  Kinder could not explain how putting on a calendar that someone would come late was offensive."  Dkt. No. 64 at ¶ 35.  Kinder testified during his deposition that Plaintiff would note on a calendar when an employee arrived late to work, and that the employee complained to Kinder "that she was feeling targeted."  Dkt. No. 60-8 at 31.  Kinder testified that it was his responsibility "to address the employee's feelings, concerns, and worry," and Plaintiff noting when someone arrived late "was consistent with [Plaintiff's] disrespectful behavior to the department as perceived by many people in the department."  *Id.* at 32-33.

In July 2017, another employee complained to Kinder that she felt Plaintiff was harassing her by placing her name on a white board after she arrived late to work.  *See* Dkt. No. 60-2 at ¶ 36.  Kinder contacted Rivera about the incident to ask that it be addressed.  *See id.*  Again, Plaintiff does not deny that those conversations occurred, but contends that "Kinder only complained because he did not like Plaintiff."  Dkt. No. 64 at ¶ 36.

Seckler was terminated in January 2018.  *See* Dkt. No. 60-2 at ¶ 37.  Defendants allege that "[t]he decision to terminate Seckler occurred after certain matters were brought to the attention of CEO Peter Stanway, that resulted in an investigation conducted by an external investigator."  *Id.*  Plaintiff does not deny that Seckler was terminated or that there was an investigation.  *See* Dkt. No. 64 at ¶ 37.  Rather, she states that "the reason for terminating Seckler

could have been that he did not want to get rid of his Asian's [sic] Executive Assistant.  Sapio was disliked because she was Asian. . . .  Rivera wanted Plaintiff to complain against Mike Seckler for discrimination."  *Id.*

Defendants assert that "Stanway decided to eliminate the position" that Seckler filled, not to hire someone new to fill the Vice President of Manufacturing position, and instead chose to assign the responsibilities to Shaffer.  Dkt. No. 60-2 at ¶ 38.  Plaintiff "denie[s]" this allegation and states that "[t]he position was not eliminated.  Brenda Shaffer assumed the interim until a new vice president was appointed, she took the role of VP of Manufacturing, which became a full-time VP Manufacturing position."  Dkt. No. 64 at ¶ 38.  Both parties agree that prior to taking over Seckler's job responsibilities, Shaffer already had an executive assistant working for her, Kristen de Bree.  *See* Dkt. No. 60-2 at ¶ 39; Dkt. No. 64 at ¶ 39.  Because there were no immediate plans to hire someone new for the Vice President of Manufacturing position and Shaffer had an executive assistant, Stanway decided "to separate employment with Plaintiff."  Dkt. No. 60-2 at ¶ 40.  Plaintiff "denie[s]" this and states that Kinder "testified that Stanway came to him to see if he could keep Plaintiff."  Dkt. No. 64 at ¶ 40.  However, Defendants explain exactly that. Defendants state that "[p]rior to effectuating the separation of Plaintiff, CEO Peter Stanway evaluated whether there were any open Executive Assistant positions available for Plaintiff and there were none."  Dkt. No. 60-2 at ¶ 41.  Stanway also tried to determine whether there were any administrative assistant positions available, which are below executive assistants, but there were none available.  *See id.*  In response, Plaintiff contends that "Rivera testified that Plaintiff was terminated because she had a bad reputation."  Dkt. No. 64 at ¶ 41.  That is an inaccurate characterization of Rivera's testimony.  Rivera testified that when Selux wanted to hire a new Executive Assistant to support the Engineering Department, months after Plaintiff's termination,

Rivera did not "call [Plaintiff] back for th[e] position" because "[s]he had a bad reputation." Dkt. No. 60-9 at 29.

Rivera and Wolf met with Plaintiff to inform her of the decision to terminate Seckler and in turn, her, because of the lack of an available position, on January 10, 2018. *See* Dkt. No. 60-2 at ¶ 42. In response, Plaintiff again reiterates that Seckler's position was not being eliminated but given to Shaffer and that she was not solely supporting Seckler at the time but was also supporting Kinder. *See* Dkt. No. 64 at ¶ 42. During the meeting, Rivera and Wolf presented Plaintiff with a Separation Agreement. *See* Dkt. No. 60-2 at ¶ 43. Plaintiff asserts that Rivera and Wolf could not explain or understand the Separation Agreement. *See* Dkt. No. 64 at ¶ 43. During their respective depositions, Wolf and Rivera both stated that they read through the document with Plaintiff during the meeting but did not try to explain all of its terms. *See* Dkt. No. 60-7 at 24-28; Dkt. No. 60-9 at 34-36. Rather, Rivera advised Plaintiff that if she had questions about the agreement, she could consult an attorney. *See* Dkt. No. 60-2 at ¶ 44. Plaintiff's employment with Selux formally ended on January 10, 2018. *See* Dkt. No. 60-2 at ¶ 45.

Plaintiff had possession of the Separation Agreement for nineteen days, during which time "she read over the Agreement several times and although she was upset about her position being eliminated, she felt like this could be an opportunity to find a position that was more suited for her." Dkt. No. 64 at ¶ 47. Despite knowing that she had the right to seek the advice of an attorney, Plaintiff "did not believe that she needed an attorney to explain the Separation Agreement to her." *Id.* at ¶ 48. Plaintiff executed the agreement in the presence of a notary on January 29, 2018, and returned the agreement to Rivera. *See id.* at ¶¶ 46, 49. The agreement was stamped "Received" on January 30, 2018. *Id.* at ¶ 50. Selux paid Plaintiff $7,346.64 in accordance with the terms of the Separation Agreement. *See* Dkt. No. 60-2 at ¶ 51.

Plaintiff states that she "made corrections on the separation agreement."  Dkt. No. 64 at ¶ 44.  Defendants contend that Wolf and Rivera viewed the agreement after it was signed and did not see any changes.  *See* Dkt. No. 60-2 at ¶ 53.  Plaintiff asserts that she "made some changes to the agreement which were rejected at first."  Dkt. No. 64 at ¶ 53.  However, she admits that she "understood the terms of the Separation Agreement."  Dkt. No. 60-2 at ¶ 54; Dkt. No. 64 at ¶ 54.  Additionally, the parties agree that the Separation Agreement attached to Defendants' motion for summary judgment is the Separation Agreement that Plaintiff signed and had notarized.  *See* Dkt. No. 60-2 at ¶ 52; Dkt. No. 64 at ¶ 52; Dkt. No. 60-12.  Plaintiff's signature on the Agreement is dated January 29, 2018, and the document is notarized.  *See* Dkt. No. 60-12 at 8.  There are no changes, edits, or markings on the Agreement attached to Defendants' motion.  *See generally id.*

Until April 2018, Rivera and Janine Dunham comprised Selux's Human Resources Department.  *See* Dkt. No. 64 at ¶ 65.  Selux hired Ronna Foroglou in April 2018 as Director of Human Resources.  *See id.* at ¶ 66.  Stanway then determined that three individuals were not needed in the Human Resources Department but that the responsibilities in the Engineering Department were increasing.  *See* Dkt. No. 60-2 at ¶¶ 67-69.  Stanway spoke to Kinder about whether he could use the support from Dunham, which Kinder confirmed.  *See id.* at ¶ 70.  Kinder testified that the needs of the Engineering Department had significantly increased from the time Plaintiff was terminated until April 2018, when Dunham changed positions from Human Resources to Engineering.  *See* Dkt. No. 60-8 at 25-26.  Kinder stated that he did not need the extra help at the time Plaintiff was terminated.  *See id.* at ¶ 71.  Kinder also stated that even if he did need the assistance, he would not have wanted to work with Plaintiff because of the past issues between Plaintiff and Kinder's employees.  *See id.* at ¶ 72.  Kinder testified that Plaintiff was disrespectful to other employees.  *See* Dkt. No. 60-8 at 27.  Defendants contend that

9

additional support was also needed for the safety team which was run by Safety Director Steve Kienle. *See id.* at ¶ 73. Dunham had previously worked on the Safety Committee and Kienle confirmed with Rivera that he could use Dunham's assistance. *See id.* Dunham was then offered an Administrative Assistant position to assist the Engineering and Safety teams. *See id.* at ¶ 74.

Plaintiff disagrees. Plaintiff contends that prior to her termination, Defendants had planned to replace Plaintiff with Dunham because Rivera told Plaintiff that Kinder was hiring Dunham. *See* Dkt. No. 64 at ¶ 67. Plaintiff asserts that Kinder needed Dunham's assistance not because the Engineering Department's increased workload, but because Plaintiff was terminated. *See id.* at ¶ 69. She asserts that Kinder recommended that Dunham be hired as his assistant. *See id.* at ¶ 70. Plaintiff denies that Kinder told Stanway the Engineering Department did not need extra help at the time of her termination, by stating that "Stanway testified there was no position open for Plaintiff." *Id.* at ¶ 71. She also states that Kinder's opposition to her working with his team was not about her relationship with his employees but because Kinder "did not like Plaintiff because she is of Asian [descent]." *Id.* at ¶ 72. She contends that Dunham "never testified that she was helping the safety director." *Id.* at ¶ 73. Plaintiff states that Dunham's Administrative Assistant position was a new position that was created without an interview process. *See id.* at ¶ 74.

Rivera testified that Dunham previously worked on the Safety Committee and Rivera was the one who asked the Safety Director if he could use additional help. *See* Dkt. No. 60-9 at 22. During Dunham's deposition, Plaintiff's counsel asked what Dunham's responsibilities were when she worked with Kinder. *See* Dkt. No. 60-6 at 14. Dunham was not asked about, nor did she testify to, her work for the Safety Director. *See id.* The parties agree that Dunham's Administrative Assistant position "was a non-exempt hourly position, in which Dunham was paid

$20.50 per hour, which is the same rate of pay that she was paid in her prior HR Assistant role."

Dkt. No. 64 at ¶ 75.

Defendants assert that Rivera, Kinder, and Kienle developed Dunham's job description and although Dunham "did not have all the requisite skills for the position, she was willing to learn, and she was trained for the role to perform the administrative work needed in the position." Dkt. No. 60-2 at ¶ 76.  Plaintiff states that Kinder testified that he did not help create the job description and that Stanway testified that Dunham was qualified for the position.  *See* Dkt. No. 64 at ¶ 76.  Defendants aver that Dunham's position as an Administrative Assistant was different than Plaintiff's position as an Executive Assistant.  *See* Dkt. No. 60-2 at ¶ 77.  However, Plaintiff contends that the Administrative Assistant job duties were a part of her responsibilities as an Executive Assistant.  *See* Dkt. No. 64 at ¶ 77.  However, an additional part of Dunham's job was to recruit more engineers.  *See* Dkt. No. 60-2 at ¶ 78; Dkt. No. 64 at ¶ 64.

Kinder testified during his deposition "that was me" when asked if he created the job description for Dunham's position, but explained after viewing the job description that he was not involved in creating the document.  Dkt. No. 60-8 at 14-15.  Kinder stated that the job description also required Dunham to report to "[t]he facilities manager[,] Steve."  *Id.* at 15.  He testified that he was going to use Dunham to recruit more engineers.  *See id.* at 24.  Plaintiff submitted the job description to the Court, which confirms that the Administrative Assistant position reported to the Director of Engineering and the Facilities Manager.  *See* Dkt. No. 63-3.

"In December 2021, Selux revived the position of Vice President of Manufacturing and hired Eric Lannon."  Dkt. No. 60-2 at ¶ 79.  Plaintiff denies this statement and alleges that "[t]he position of Vice President of Manufacturing has never been eliminated.  Brenda Shaffer assumed the interim."  Dkt. No. 64 at ¶ 79.  Defendants state that "[o]ther than alleging that she is Asian

11

and Janine Dunham is Caucasian, the only evidence that Plaintiff offered during discovery to support her discrimination claim is that Selux is a 'German company' and that in 2011, Claus Kinder mentioned that he owned 'official plates from the Nazi times.'"  Dkt. No. 60-2 at ¶ 82. Plaintiff disagrees and asserts that additional evidence lies in "the deposition of Defendants, wherein they hired Janine who was not qualified, and was hired outside the company's policy." Dkt. No. 64 at ¶ 82.  Kinder denies telling Plaintiff that he owns Nazi plates and no one else has ever heard him say it.  *See* Dkt. No. 60-2 at ¶¶ 83-84.  Plaintiff admits that Stanway, Seckler, and Wolf never made any comments toward Plaintiff that Plaintiff felt were discriminatory.  *See id.* at ¶¶ 85-87.  Defendants also note that Wolf's children are of Asian descent, Wolf's assistant controller was of Asian descent, Rivera is Hispanic, and two engineers who complained to Kinder about Plaintiff were of Indian descent.  *See id.* at ¶¶ 87, 89.  Plaintiff testified that most individuals she worked with were white and that the higher-level staff were white.  *See* Dkt. No. 64 at ¶¶ 88-89.

As to the specific provisions of Plaintiff's Separation Agreement, it states, in relevant part:

> Payment: In consideration for the promises that Employee makes in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, so long as Employee provides a signed, executed copy of this Agreement and does not breach this Agreement or revoke this Agreement Employee will be eligible to receive the following from Employer:
>
> > a. Within thirty (30) days after execution of this Agreement by both parties, Employer will pay Employee a lump sum separation payment in the gross amount of Seven Thousand Three Hundred Forty-six and 64/100 ($7,346.64) Dollars, less applicable withholdings and deductions, said amount equal to two months of Employee's regular base salary . . . .

Dkt. No. 60-2 at ¶ 55; *see also* Dkt. No. 60-12 at 2.  Plaintiff understood those terms and "acknowledged that the amount she received represented two months of her regular base salary."

Dkt. No. 64 at ¶ 56.  She also understood that she would not have been entitled to the compensation had she not signed the Agreement.  *See id.* at ¶ 57.  Plaintiff received the severance payment, but then later returned the money to Selux subsequent to filing her complaint in this action.  *See* Dkt. No. 60-2 at ¶ 58; Dkt. No. 64 at ¶ 58.

The following paragraph of the Separation Agreement sets forth the release:

> Employee Release: Except as described in paragraph "7" herein, Employee knowingly releases and discharges Employer from all claims, actions, causes of action, suits, charges, damages and demands whatsoever, in law or equity, which Employee ever had, has or hereafter may have against Employer, directly or indirectly, whether known or unknown, from the beginning of her employment to the date of this Agreement.  Employee acknowledges that this RELEASE includes all claims arising out of her employment and the separation of that employment . . . including, but not limited to, all claims under . . . Sections 1981 through 1988 of Title 42 of the United States Code . . . the New York Human Rights Law . . . and any other federal, state or local employment laws and regulations, and all common law claims of the State of New York, including, but not limited to, claims of express or implied contract, wrongful discharge, defamation, slander, intentional and negligent infliction of emotional distress, and all claims for attorneys' fees, costs and expenses, and any other claims arising out of or related to Employee's employment with Employer, and the termination of that employment . . . .

Dkt. No. 60-2 at ¶ 59; *see also* Dkt. No. 60-12 at 3.  Further,

> Employee has read and understands this Agreement and knowingly and voluntarily enters into this Agreement without fraud, duress, or any undue influence.
>
> • Employee acknowledges that by this Agreement the Employer advised Employee in writing to consult with an attorney before signing the Agreement.
>
> • Employee understands the language of this Agreement and its meaning, particularly with respect to Employee's waiver and release of any claims against the Employer.

> • Employee has 21 days to consider the terms of this agreement but
> may voluntarily elect to sign the agreement in a shorter period of
> time in order to receive the consideration set forth in paragraph "2."
>
> • Employee is receiving payment and other consideration from the
> Employer that Employee would not otherwise be entitled.
>
> • Employee is not waiving any rights or claims that may arise after
> the date this Agreement is executed.

Dkt. No. 60-2 at ¶ 61; *see also* Dkt. No. 60-12 at 5.  The Agreement states that "Employee understands and agrees that this Agreement may be pled by Employer as a complete defense to any claim or entitlement which may be asserted by Employee . . . in any suit, claim or proceeding against Employer. . . ."  Dkt. No. 60-2 at ¶ 63; *see also* Dkt. No. 60-12 at 7.  The Separation Agreement also contains an Integration Clause which provides:

> Entire Agreement: This Agreement constitute(s) the final, complete,
> and exclusive statement of the terms of the agreement between the
> parties pertaining to the subject matter of this Agreement and
> supersedes all prior and contemporaneous understandings or
> agreements of the parties.  This Agreement may not be contradicted
> by evidence of any prior or contemporaneous statements or
> agreements.  No party has been induced to enter into this
> Agreement by, nor is any party relying on any representation,
> understanding, agreement, commitment or warranty outside those
> expressly set forth in this Agreement.

Dkt. No. 60-2 at ¶ 64; Dkt. No. 64 at ¶ 64; Dkt. No. 60-12 at 7.  The Agreement includes a "Covenant Not to Sue" which notes:

> Except as described in paragraph "7" herein, Employee represents
> and warrants that Employee, and any person, organization, or other
> entity acting on her behalf, has not filed and will not file any claim,
> charge or lawsuit (civil, administrative or criminal) against
> Employer, either individually in any type of proceeding or as a
> member of a class, based upon acts, occurrences or events occurring
> prior to the signing of this Agreement.  If Employee breaches this
> provision and files an action falling within its scope, Employee
> agrees to indemnify Employer for all costs, including, but not
> limited to, court costs and reasonable attorneys' fees, incurred by

14

> Employer in the defense of such action or in establishing or
> maintaining the application or validity of this Agreement or the
> provisions thereof.

Dkt. No. 60-2 at ¶ 94; *see also* Dkt. No. 60-12 at 3-4.

Plaintiff denies Defendants' reliance on these provisions insofar as she asserts she "was misled to sign the separation agreement.  At the time she signed, she had no reason to doubt the separation agreement."  Dkt. No. 64 at ¶¶ 59-64.  She does not dispute the contents of the Agreement.  *See id.*  Plaintiff understood that she had a right to consult with an attorney.  *See* Dkt. No. 60-2 at ¶ 62; Dkt. No. 64 at ¶ 62.  Plaintiff testified that the covenant not to sue provision meant: "I will not sue the company for any civil, administrative or criminal claims."  Dkt. No. 60-4 at 69-70.

### III. DISCUSSION

#### A.   Summary Judgment Standard

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law.  *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted).  When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried."  *Id.* at 36-37 (quotation and other citation omitted).  It is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleadings.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting FED. R. CIV. P. 56 (c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party.  *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 255 (1986)) (other citations omitted).  "Assessments of credibility and choices between

conflicting versions of the events are matters for the jury, not for the court on summary

judgment."  *Jeffreys v. City of New York*, 426 F.3d 549, 553-54 (2d Cir. 2005) (quotation

omitted).  "However, '[t]he mere existence of a scintilla of evidence in support of the plaintiff's

position will be insufficient; there must be evidence on which the jury could *reasonably* find for

the plaintiff.'"  *Id.* (quoting *Anderson*, 477 U.S. at 252 (alterations in original)).  "To defeat

summary judgment, therefore, nonmoving parties 'must do more than simply show that there is

some metaphysical doubt as to the material facts,' . . . and they 'may not rely on conclusory

allegations or unsubstantiated speculation.'"  *Id.* (quotations omitted).

**B.   Contract Release**

Defendants argue that because all of Plaintiff's claims arise out of her employment and

termination from Selux and she signed a binding Separation Agreement which contained a

release, her complaint must be dismissed.  *See* Dkt. No. 60-1 at 4-5.  Plaintiff argues that the

release in the Separation Agreement cannot be enforced because she was misled about the

Agreement.  *See* Dkt. No. 65 at 11.  Plaintiff states that "Defendants have missed, and still are

missing the issue here.  It is whether Plaintiff was misled in signing the agreement and not

whether she understood the agreement.  Assuming *arguendo* that Plaintiff was not misled, the

separation agreement still contains legal terms that only a lawyer could understand."  *Id.*  Plaintiff

argues that because she returned the consideration that she received, the Agreement is voidable,

and it is invalid because it was obtained by fraud and misrepresentation.  *See id.*  Plaintiff states

that she "was misled that her position had been eliminated."  *Id.* at 14.[2]

---

[2] Plaintiff argues that she "has already established that the Separation Agreement was obtained
through fraud and misrepresentation.  Defendants made the same arguments before the Second
Circuit, and they were  rejected.  However, Defendants still hang tooth and nail on the argument

"A settlement agreement and release are contracts, and are [] construed according to general principles of contract law." *Barshay v. Naithani*, No. 20-CV-8579, 2023 WL 2051170, *7 (S.D.N.Y. Feb. 16, 2023), *aff'd*, No. 23-382, 2023 WL 8708424 (2d Cir. Dec. 18, 2023) (citing, *inter alia*, *Collins v. Harrison-Bode*, 303 F.3d 429, 433 (2d Cir. 2002)).  "Under New York law, the enforceability of the release as to [a] NYHRL claim is governed by contract law principles.  If 'the language of a release is clear and unambiguous, the signing of a release is a jural act binding on the parties[.]'" *Long v. Corning Inc.*, 847 Fed. Appx. 74, 75 (2d Cir. 2021) (quoting *Albany Sav. Bank, FSB v. Halpin*, 117 F.3d 669, 672 (2d Cir. 1997)) (additional footnote omitted).  Likewise, "'an employee can release federal claims of discrimination, whether under the ADA, Title VII, the ADEA or similar statutes . . . provided the waiver is knowing and voluntary.'" *Gallo v. Inter-Con Sec. Sys. Inc.*, No. 20-CV-4879, 2021 WL 3913539, *5 (S.D.N.Y. Sept. 1, 2021) (quoting *Hseuh v. Bank of N.Y.*, No. 05-CV-5345, 2005 WL 2842069, *3 (S.D.N.Y. Oct. 31, 2005)).

"Where a 'contract is clear and unambiguous on its face, the intent of the parties must be gleaned from within the four corners of the instrument, and not from extrinsic evidence.'" *RJE*

---

that the separation agreement was valid." Dkt. No. 65 at 17.  Plaintiff also reiterates the Second Circuit's statement that "Selux gave her false, pretextual reasons for her termination." *Id.* at 11. As Defendants explain in their reply, Plaintiff is relying on the wrong standards. *See* Dkt. No. 66 at 8.  The Second Circuit was reviewing the Court's decision granting a motion to dismiss. *See Sapio*, 844 Fed. Appx. at 457.  The standards for reviewing a motion to dismiss and motion for summary judgment are different.  At the motion to dismiss stage, the Court is required to accept Plaintiff's allegations as true. *See Nat'l Rifle Ass'n of Am. v. Vullo*, 49 F.4th 700, 713 (2d Cir. 2022). The same cannot be said at the motion for summary judgment stage. *See 33 Seminary LLC v. City of Binghamton*, No. 3:11-CV-1300, 2013 WL 2446306, *10 (N.D.N.Y. June 5, 2013) (quotation omitted) ("[The p]laintiffs are cautioned to appreciate the 'distinction' between the Rule 12(b)(6) standard and the summary judgment standard.  The burden on the movant is significantly different on a motion for summary judgment.  On a motion for summary judgment, plaintiffs face the burden of citing to facts in the record and 'must go beyond the pleadings'").  Accordingly, Plaintiff's reliance on the Second Circuit's decision is misplaced.

*Corp. v. Northville Indus. Corp.*, 329 F.3d 310, 314 (2d Cir. 2003) (quoting *De Luca v. De Luca*, 300 A.D.2d 342, 342 (2d Dept. 2002)); *see also Kass v. Kass*, 91 N.Y.2d 554, 566 (1998) ("Ambiguity is determined by looking within the four corners of the document, not to outside sources"); *Collins v. Harrison-Bode*, 303 F.3d 429, 433 (2d Cir. 2002) (footnote omitted) ("Under New York law, the question of ambiguity *vel non* must be determined from the face of the agreement, without reference to extrinsic evidence").

A party may rely on "parol evidence or other extrinsic evidence — including 'exchanges between the contracting parties during the course of negotiations, as well as post-execution conduct of the parties in performing the contract, [and] admissions by the parties and . . .'— [] only [] upon a finding of ambiguity in the contract in the first instance." *Barshay*, 2023 WL 2051170, at *8 (quoting *Fitzpatrick v. Am. Int'l Grp., Inc.*, No. 10-CV-142, 2013 WL 5427883, *3 (S.D.N.Y. Sept. 27, 2013)) (additional citations omitted). "Likewise, a court should not consider other extrinsic evidence, like the parties' 'interpretation of the contract in practice, prior to litigation,' . . ., absent a finding that a 'contract term is ambiguous[.]'" *Id.* (quoting *Ocean Transp., Inc. v. American Philippine Fiber Indus., Inc.*, 743 F.2d 85, 91 (2d Cir. 1984); *Matter of MPM Silicones, L.L.C.*, 874 F.3d 787, 796 (2d Cir. 2017)).

However, "while general releases are governed by contract law, '[their] interpretation and limitation by the parol evidence rule are subject to special rules . . . based on a realistic recognition that releases contain standardized, even ritualistic[ ] language[.]'" *Id.* at *9 (quoting *Mangini v. McClurg*, 24 N.Y.2d 556, 562 (1969)) (alterations in original). "Accordingly, courts applying New York law have more carefully scrutinized the context and language used in releases to ascertain whether a given dispute or transaction falls within a given release's scope." *Id.* (citations omitted). "Thus, even where a release employs broad language seemingly

encompassing a claim, courts will 'limit[ ] [it] to those claims within the contemplation of the parties at the time' as evidenced from the purpose for which the release was given and the context in which it was signed." *Id.* (quoting *In re Actrade Fin. Techs., Ltd.*, 424 B.R. 59, 69-71 (Bankr. S.D.N.Y. 2009)).  "Still, where a release's language is broad and nothing suggests it is inapplicable to the case at hand, courts will, in line with general contract principles, apply the release as written." *Id.* (collecting cases).

A court "analyze[s] whether a release is valid under a 'totality of the circumstances' inquiry." *Long*, 847 Fed. Appx. at 75 n.7 (quoting *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 438 (2d Cir. 1998); citing *Bormann v. AT&T Commc'ns, Inc.*, 875 F.2d 399, 403 (2d Cir. 1989)).  The "totality of the circumstances" inquiry requires consideration of the following factors, often referred to as the *Bormann* factors:

> (1) the plaintiff's education and business experience; (2) the amount of time the plaintiff had possession of or access to the agreement before signing it; (3) the role of the plaintiff in deciding the terms of the agreement; (4) the clarity of the agreement; (5) whether the plaintiff was represented by or consulted with an attorney; (6) whether the consideration given in exchange for the waiver exceeds any benefits to which the employee was already entitled by contract or law; (7) whether an employer encouraged or discouraged the employee to consult with an attorney; and (8) whether the employee had a fair opportunity to consult with an attorney.

*Laramee v. The Jewish Guild for the Blind*, 72 F. Supp. 2d 357, 360 (S.D.N.Y. 1999).  "The factors are not exhaustive nor must all of the factors be satisfied before a release is enforceable." *Vallely v. United Parcel Serv., Inc.*, No. 3:18-CV-0284, 2019 WL 78985, *5 (N.D.N.Y. Jan. 2, 2019).

Defendants argue that the factors weigh in their favor.  *See* Dkt. No. 60-1 at 10.  Plaintiff does not address the factors but relies on the fact that Plaintiff returned the monetary

consideration that she received from Defendants as part of the Agreement to negate enforcement of the Agreement.  *See* Dkt. No. 65 at 11-14.

### 1.  *Parol Evidence*

Defendants argue that Plaintiff's fraud claim must be dismissed not only because Plaintiff has failed to raise a dispute of fact as to whether Defendants made a false representation and intended to defraud her, but also because of the existence of the Integration Clause in the Separation Agreement.  *See* Dkt. No. 60-1 at 14.  Defendants contend that "because the Separation Agreement does not reference the elimination of Plaintiff's position as the justification for her termination, Plaintiff cannot allege that she justifiably relied on any such representation of Rivera or Wolf as a reason for signing the Agreement because, by signing, she conceded that only the four corners of the Agreement controlled the terms of her separation."  *Id.*  Plaintiff does not respond to this aspect of Defendants' motion.  *See generally* Dkt. No. 65.

Plaintiff does not argue that any words or phrases in the Separation Agreement are ambiguous.  *See generally id.*  Rather, she repeatedly confirmed in her deposition testimony that she fully understood the terms of the Agreement.  *See* Dkt. No. 60-4 at 66-67, 70-71, 75.  Insofar as she "denie[s]" various assertions that Defendants made in their statement of material facts concerning the language in the Separation Agreement, she does so only to the extent that she "was misled to sign the separation agreement."  Dkt. No. 64 at ¶¶ 61-64.  To prove that she was "misled" Plaintiff relies on conversations between herself and Rivera whereby prior to being terminated, Rivera told Plaintiff that she was trying to get Dunham to work for Kinder.  *See* Dkt. No. 65 at 15, 24.

The Separation Agreement contains an integration clause delineating the entirety of the Agreement.  *See* Dkt. No. 60-12 at 7.  Plaintiff does not dispute the contents of this clause or

argue that the Agreement does not constitute the entire Agreement.  *See* Dkt. No. 65.  As Plaintiff

has not presented any evidence that any terms in the Agreement are ambiguous, extrinsic

evidence of the conversations would generally be barred.  *See Barshay*, 2023 WL 2051170, at *8.

However, because Plaintiff alleges fraud that, if proven, would require the entire contract to be

voided, the Court may consider extrinsic evidence.  *See In re Thomson McKinnon Sec. Inc.*, 139

B.R. 267, 275 (S.D.N.Y. 1992) ("As a general matter, the parol evidence rule does not apply

where fraud is alleged. . . .  [P]roof of fraud may only be introduced to show the intent of the

parties such that the entire contract is a nullity and may not be offered to demonstrate that some

provisions of an agreement should not be enforced . . . ."); *Stanley v. Bray Terminals, Inc.*, 197

F.R.D. 224, 228 (N.D.N.Y. 2000) ("When a party alleges that it was fraudulently induced to enter

into an agreement that contains a general merger clause, a court can examine evidence outside the

four corners of the contract to determine if the allegation has merit").  Whether Plaintiff's fraud

claim has any merit will be discussed separately in this Memorandum-Decision and Order.

However, first the Court will address Defendants' argument that the release in the Separation

Agreement bars Plaintiff's claims.

     *2.  Knowing and Voluntary*

     Insofar as Plaintiff argues that Defendants "are missing the issue here[,]" Dkt. No. 65 at

11, the Court disagrees.  Whether Plaintiff entered into the Separation Agreement knowingly and

voluntarily is an issue the Court must address to determine whether the Agreement should be

enforced and whether Plaintiff breached the Agreement.

     In determining whether the Court should enforce the release in the Separation Agreement,

as to the first *Bormann* factor—Plaintiff's education and business experience—"courts have only

required a high school equivalency diploma." *Brewer v. GEM Indus. Inc.*, No. 1:14-CV-00778,

2015 WL 773800, *5 (N.D.N.Y. Feb. 24, 2015) (citing, *inter alia*, *Bachiller v. Turn on Products, Inc.*, No. 00-CV-8701, 2003 WL 1878416, *4 (S.D.N.Y. Apr. 14, 2003), *aff'd*, 86 Fed. Appx. 465 (2d Cir. 2004) ("[The p]laintiff, who has a high school Equivalency Diploma and who at the time her employment was terminated was an accounts payable clerk, was capable of understanding the Release and the Notice")); *see also Mandavia v. Columbia Univ.*, No. 12-CV-2188, 2013 WL 2391695, *6 (S.D.N.Y. June 3, 2013), *aff'd*, 556 Fed. Appx. 56 (2d Cir. 2014).  It is undisputed that Plaintiff holds an associate degree in business administration.  *See* Dkt. No. 64 at ¶ 9.  Thus, this factor weighs in Defendants' favor.

Next, as to the amount of time Plaintiff had possession of or access to the Agreement before signing it, "[c]ourts have found that 'even a few hours will suffice' to satisfy this factor." *Brewer*, 2015 WL 773800, at *6 (quoting *Mandavia v. Columbia University*, 912 F. Supp. 2d 119, 130 (S.D.N.Y. 2012)).  It is undisputed that Plaintiff held onto the agreement for nineteen days. *See* Dkt. No. 60-2 at ¶ 46; Dkt. No. 64 at ¶ 46.  Therefore, this factor weighs in Defendants' favor. *See Mandavia*, 2013 WL 2391695, at *7 (citations omitted) ("[T]his is not a case where the plaintiff was pressured into waiver after a brief, high-pressure period. . . .  Accordingly, [the p]laintiff's sporadic opportunities to review the terms of the Agreement during the two-week negotiation period, and the several hours afforded to him the day that he signed, are sufficient for the second *Bormann* factor to weigh in favor of the Agreement's validity").

As to the role of Plaintiff in deciding the terms of the Agreement, Plaintiff testified during her deposition that she "felt rushed" in meeting with Rivera and Wolf.  Dkt. No. 60-4 at 52.  She noted that there was a different name on the Agreement when she first received it, and Rivera left the room and came back with it corrected.  *See id.* at 56.  Plaintiff explained that following that meeting, she reviewed the Agreement numerous times, noted some questions that she had for

Defendants, but did not make any changes to the Agreement.  *See id.* at 81.  She testified that she had questions about the Agreement when she dropped it off to Rivera, but she could not remember what those questions were during her deposition.  Dkt. No. 60-4 at 80.  There are no changes made on the Agreement attached to Defendants' motion.  *See* Dkt. No. 60-12.  Although Plaintiff did not negotiate the terms of the Agreement, "courts have held that the absence of this factor alone does not create an issue as to voluntariness."  *Brewer*, 2015 WL 773800, at *6 (citing *Reid v. IBM Corp.*, No. 95-CV-1755, 1997 WL 357969, *5 (S.D.N.Y. June 26, 1997)); *see also Bormann*, 875 F.2d at 403 n.1 ("Although appellants apparently did not have an opportunity to negotiate the terms of the waiver, which is one of the issues relevant to whether the release was signed knowingly and willfully, we do not believe that this fact alone requires a trial on 'voluntariness'").

Concerning the clarity of the Agreement, the document totals six and a half pages.  *See* Dkt. No. 60-12.  The language in the release contains some more advanced terms such as "non-disparagement" and references various federal statutes such as Title VII of the Civil Rights Act of 1964, the Worker Adjustment Retraining and Notification Act, and New York Human Rights Law.  *See* Dkt. No. 60-12 at 3-4.  However, the Agreement explains in plain language the amount of money Plaintiff would receive for signing the Agreement and that the Agreement "releases and discharges Employer from all claims . . . arising out of her employment and the separation of that employment . . . ."  *Id.* at 3.

Courts repeatedly find this factor in favor of enforcing an agreement where the terms of an agreement are clear and unambiguous.  *See Mandavia*, 2013 WL 2391695, at *8 ("[The p]laintiff agreed to 'release Columbia University and its agents from any and all claims arising from the facts and circumstances at issue herein.'  This is not technical language"); *Westbrooke v. Bellevue*

23

*Hosp. Ctr.*, No. 16-CV-9845, 2018 WL 4189514, *4 (S.D.N.Y. Aug. 31, 2018) (internal citations omitted) ("And the Agreement itself removes any lingering doubt: the release plainly covers all claims 'arising' prior to 'the date of th[e] Agreement' against HHC, the City of New York, or their 'officers, employees, and agents'—of which Westbrooke elsewhere concedes Bellevue is one[.]. . . The release also explicitly applies to claims "arising from [Westbrooke's] employment.' . . . The Agreement thus clearly and unambiguously applies to, and therefore bars, Westbrooke's current employment-based claims, which all arose prior to the Agreement being signed in June 2015").

Plaintiff argues that "the separation agreement still contains legal terms that only a lawyer could understand.  HR manager herself could not explain what Title 7 stood for in the separat[ion] agreement because it was a legal term and could not explain during her deposition although she claimed she read the entire agreement to Plaintiff."  Dkt. No. 65 at 11 (citation omitted).  However, Plaintiff repeatedly affirmed in her deposition testimony that she did not have any problem understanding the terms in the Agreement.  *See* Dkt. No. 60-4 at 66, 67, 71, 75.  Plaintiff did testify "I had questions on some paragraphs. . . .  I don't remember at this point.  I don't remember. . . .  I'm trying to remember.  There are some things that I had questions and I wrote on it to make sure which area I had a question on."  *Id.* at 80-81.  She explained that she identified the questions for Rivera and Rivera told Plaintiff not to "worry about that."  *Id.* at 81.  Plaintiff testified that she initialed or wrote on the document where she had questions.  *See id.* at 80-81.  There are no initials or writing on the document that both parties agreed is the Separation Agreement that Plaintiff signed and had notarized.  *See* Dkt. No. 60-12.

Plaintiff testified that she understood the Agreement to mean: "That I would get this wage if I signed it.  And if I don't, I would not get this money.  That's how I understood it."  Dkt. No. 60-4 at 65.  At the time she received the Agreement, she did not "think anything stood out."  *Id.*

During her deposition she was asked: "Did you understand that by signing this agreement, you were releasing the company from any claims that you might have against the company?"  *Id.* at 67.  She replied,  "Oh, yes, yes."  *Id.*  She was then asked to explain in her own words, what the release meant, and she responded, "[t]hat I will not sue the company for any civil, administrative or criminal claims" and "[t]hat if I do breach this agreement, that I will be responsible for attorneys and court fees."  *Id.* at 70-71.

Plaintiff presents no case law to support a proposition that including legal statutes in a Separation Agreement creates ambiguity.  *See* Dkt. No. 65.  Although there are legal terms contained in the Agreement, because Plaintiff repeatedly affirmed her understanding of the agreement, this factor weighs in Defendants' favor.

The Court will next address the factors concerning counsel— whether the plaintiff was represented by or consulted with an attorney, whether an employer encouraged or discouraged the employee to consult with an attorney, and whether the employee had a fair opportunity to consult with an attorney.  It is undisputed that Defendants informed Plaintiff of her right to seek the assistance of counsel.  *See* Dkt. No. 60-4 at ¶¶ 44, 48, 62; Dkt. No. 64 at ¶¶ 44, 48, 62.  The Separation Agreement also advises Plaintiff to consult with an attorney.  *See* Dkt. No. 60-12 at 5.  Plaintiff had more than two weeks in which she held onto the Agreement and could have retained the assistance of counsel.  *See* Dkt. No. 60-2 at ¶¶ 46-47; Dkt. No. 64 at ¶¶ 46-47.  She did not do so.  When asked if she understood the provision of the Separation Agreement advising Plaintiff to consult with an attorney, Plaintiff responded, "I didn't think I needed an attorney, so yes, I understood that."  Dkt. No. 60-4 at 71.

The fact that an attorney was not involved in the negotiation of Plaintiff's Separation Agreement weighs in Plaintiff's favor.  *See Brewer*, 2015 WL 773800, at *7 (citing, *inter alia*,

*Figueroa v. MRM Worldwide*, No. 12-CV-4115, 2014 WL 902953, *8 (S.D.N.Y. Mar.7, 2014)

(holding that the plaintiff's failure to consult an attorney means this factor weighs in his favor)).

However, that Defendants told Plaintiff that she could seek counsel, the Agreement advised

Plaintiff of this right, and she chose not to because she understood the terms, weighs in favor of

enforcing the agreement. *See Brewer*, 2015 WL 773800, at *7 (quoting *Bachiller*, 2003 WL

1878416, at *4)) ("Language within the separation agreement and release that 'advises [the

p]laintiff of [his] right to consult an attorney' is sufficient to tip this factor in [the d]efendant's

favor").

Finally, as to the issue of consideration, "determinative for this factor is whether the

plaintiff 'would not have otherwise received' the consideration given in exchange for the waiver."

*Brewer*, 2015 WL 773800, at *7 (quoting *Hsueh v. The Bank of New York*, No. 05-CV-5345,

2006 WL 2778858, *5 (S.D.N.Y. Sept. 26, 2006)).  There is no dispute that Plaintiff received

$7,346.64 in accordance with the terms of the Separation Agreement and that she would not have

received the consideration but for signing the Agreement.  *See* Dkt. No. 60-2 at ¶ 51; Dkt. No. 64

at ¶ 51; Dkt. No. 60-12 at 2.  Thus, the totality of circumstances weigh heavily in Defendants'

favor and in favor of enforcement of the release as knowingly and voluntarily signed.  *See*

*Westbrooke v. Bellevue Hosp. Ctr.*, No. 16-CV-9845, 2018 WL 4189514, *5 (S.D.N.Y. Aug. 31,

2018) (citing *Nicholas v. Nynex, Inc.*, 929 F. Supp. 727, 732 (S.D.N.Y. 1996)) ("Thus, although

[the p]laintiff's lack of participation in drafting the terms of the agreement and her lack of legal

counsel could in other circumstances indicate that a release was involuntary, they do not shift the

balance of the *Bormann* factors here, which 'overwhelmingly favor' [the d]efendants and

enforcing the agreement").

However, Plaintiff returned the money to Selux in March 2019.[3]  *See* Dkt. No. 63-4.  It is on this point that Plaintiff exclusively relies to argue that the Court should deny Defendants' motion concerning the release.  *See* Dkt. No. 65 at 11-14.  Plaintiff references the doctrines of ratification and tender back, arguing that she did not ratify the Separation Agreement because she tendered back her benefits that were given in consideration of the Agreement.  *See id.*  Defendants argue that neither doctrine supports invalidating the Agreement because "Plaintiff signed the Separation Agreement on January 29, 2018, but did not attempt to return the consideration paid to her until March 11, 2019, more than a year later."  Dkt. No. 66 at 8.

"In the contractual context, ratification . . . is defined in modern legal usage as '[a] person's binding adoption of an act already completed but . . . not done in a way that originally produced a legal obligation.'"  *Brown v. City of S. Burlington, Vt.*, 393 F.3d 337, 343 (2d Cir. 2004) (quoting Black's Law Dictionary 290 (8th ed. 2004)).  "It occurs at the point that a party learns that his prior agreement not to sue is voidable but continues to accept the benefits of that agreement. . . . A key element of ratification, therefore, is the failure of the plaintiff to tender back . . . the consideration that he received in exchange for executing the release."  *Livingston v. Bev-Pak, Inc.*, 112 F. Supp. 2d 242, 249 (N.D.N.Y. 2000) (citations omitted).  "The rule requiring the tender of consideration received, as a condition to rescission of a contract such as a release, is said to be a general principle of the common law of contracts."  *Brown*, 393 F.3d at 344 (2d Cir. 2004) (citing *Fleming v. United States Postal Serv.*, 27 F.3d 259, 260 (7th Cir. 1994)).  "Avoiding a contract of release on the ground of fraudulent misrepresentation, then, requires not only manifestation of an intention to avoid the release within a reasonable time after discovery of the fraud but also return

---

[3] Plaintiff's check and letter to Selux is dated March 11, 2019.  *See* Dkt. No. 63-4 at 2-3.  The certified postal mail receipt is dated March 12, 2019.  *See id.* at 4.

of any consideration received by the releasor within a reasonable time." *Id.* at 345 (citing 66 Am. Jur. 2d Release § 46 (2001)).  "According to the general rule, '[w]hether the return was timely is ordinarily a question of fact.' . . .  Tenders of consideration have been held timely even where they were made after commencement of an action and even at trial on the original claim." *Id.* (quotation omitted) (citing H. Havighurst, *Problems Concerning Settlement Agreements*, 53 Nw. U. L. Rev. 283, 311-13 & n.100 (1958) (noting that it has been the practice of some courts to allow plaintiffs to tender back consideration for settlement agreements just prior to, or even during, trial; and citing a "substantial number of courts" holding "that, although the release [was] voidable and not void, tender [was] unnecessary")).

"'New York has abolished the "tender back" rule.'"  *Sapio*, 2021 WL 4844274, at *2 (quoting *Cavelli v. N.Y.C. Dist. Council of Carpenters*, 816 F. Supp. 2d 153, 166 (E.D.N.Y. 2011)).  Rather, under New York law "[a] party who has received benefits by reason of a transaction that is void or voidable because of fraud, . . . and who, in an action . . ., seeks rescission, restitution, a declaration or judgment that such transaction is void, . . . shall not be denied relief because of a failure to tender before judgment restoration of such benefits."  N.Y. C.P.L.R. 3004.  Similarly, "[f]ederal courts have also refused to enforce the tender back rule in lawsuits involving federal statutes."  *Sapio*, 2021 WL 4844274, at *2 (footnote omitted); *see also Davis v. Eastman Kodak Co.*, No. 04-CV-6098, 2007 WL 8098431, *6 (W.D.N.Y. July 19, 2007) ("Some courts have determined that enforcing the ratification and tender back doctrines defeats the remedial purposes of federal civil rights statutes").

"Courts have, however, held that failure to tender back the consideration received under a voidable release can indicate ratification of said release."  *Sapio*, 2021 WL 4844274, at *2 (citing *Nicomedez v. AIG*, No. 12-CV-490, 2012 WL 5264560, *4 (S.D.N.Y. Oct. 12, 2012) ("Upon

learning that a [release] is voidable (*i.e.* once the duress is removed or the fraud uncovered), the releasing party must promptly repudiate the . . . release or she will be deemed to have ratified it")).  "'Courts have found ratification where a releasing party waited as little as six months to repudiate the [voidable] release.'"  *Id.* (quotation omitted).

Plaintiff signed the Separation Agreement on January 29, 2018.  *See* Dkt. No. 60-12 at 8. Neither party states when Plaintiff received the $7,346.634 as consideration for her termination, but the Agreement states that she would receive it within thirty days after execution of the Agreement.  *See id.*  Plaintiff claims that she learned of the fraud "after [she] learned that [Selux] hired [Dunham]."  Dkt. No. 60-4 at 92.  She explained that sometime between April and June 2018, she learned that Dunham had been hired as an Administrative Assistant.  *See id.* at 98.  She did not initiate this lawsuit until January 4, 2019.  *See* Dkt. No. 1.  She then wrote the check for the entire amount to be returned to Selux on March 11, 2019.  *See* Dkt. No. 63-4 at 2.

Plaintiff waited over a year to return the consideration after receiving it, which was months after she learned of the alleged fraud and subsequent to her filing her complaint.  This weighs heavily in favor of finding that Plaintiff ratified the Separation Agreement.  However, the Second Circuit has cautioned that "[w]hile a lengthy passage of time *may* be a significant factor, it is not necessarily controlling."  *Brown*, 393 F.3d at 345 (reciting the factors set forth in the Restatement (Second) of Contracts §§ 381(2), (3) (1981) for determining reasonableness).  The Court must "examine the reasonableness of [the] delay in tendering back the consideration, as well as 'the extent to which [the] delay was or was likely to be prejudicial' to [the d]efendants." *Brown v. City of S. Burlington*, No. 1:01-CV-318, 2005 WL 2000716, *3 (D. Vt. Aug. 18, 2005) (quoting *Brown*, 393 F.3d at 347) (additional quotation and quotation marks omitted).

Generally, the questions of whether consideration was tendered back in a reasonable time such that a release may be unenforceable are fact-intensive inquiries that are better suited for a jury to resolve. *See Livingston*, 141 F.3d at 437-38. However, because Plaintiff has not raised a dispute of material fact as to whether Defendants defrauded her or discriminated against her, summary judgment is warranted in Defendants' favor.

### 3. *Fraud*

"'To state a claim for fraudulent misrepresentation under New York law, a plaintiff must show that (1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance.'" *City of Syracuse v. Loomis Armored US, LLC*, 900 F. Supp. 2d 274, 300 (N.D.N.Y. 2012) (quoting *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 186-87 (2d Cir. 2004)).

"New York law requires each element of fraud to be established by 'clear and convincing evidence,' both for summary judgment and trial purposes." *Hernandez v. Money Source Inc.*, No. 17-CV-6919, 2021 WL 1402257, *9 (E.D.N.Y. Mar. 5, 2021) (quoting *Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 219 (S.D.N.Y. 2007), *aff'd*, 354 Fed. Appx. 496 (2d Cir. 2009)). "New York law defines clear and convincing evidence to be a fact that is shown to be 'highly probable.'" *Id.* (quotation omitted). "This standard may be met with direct or circumstantial evidence. When the moving party seeks summary judgment against fraud claims, the movant has 'the burden of demonstrating an absence of clear and convincing evidence substantiating' the fraud claims." *Id.* (quotation omitted) (citing *Enzo Biochem, Inc. v. Johnson & Johnson*, No. 87-CV-6125, 1992 WL 309613, *3 (S.D.N.Y. Oct. 15, 1992)); *Rojas v. Cigna Health & Life Ins. Co.*, No. 14-CV-6368, 2018 WL 4759775, *7 (S.D.N.Y. Sept. 29, 2018)).

"The foregoing principle notwithstanding, courts should view summary judgment skeptically when assessing fraudulent inducement claims since those 'issues typically turn on the parties' credibility as to their state of mind.'" *Id.* at *10 (quoting *Century Pac.*, 528 F. Supp. 2d at 219). "Expressions of 'mere opinion or puffery' are 'not actionable representation of fact' sufficient to state a claim for fraud." *Spin Master Ltd. v. Bureau Veritas Consumer Prods. Servs., Inc.*, 2011 WL 1549456, *10 (W.D.N.Y. Mar. 7, 2011) (quoting *Greenberg v. Chrust*, 282 F. Supp. 2d 112, 120-21 (S.D.N.Y. 2003)).

Plaintiff focuses on various "conflicted testimonies" to support her fraud claim. Dkt. No. 65 at 15. She avers that there is conflicting deposition testimony about the extent of her support to Kinder, whether Dunham was the most qualified for the Administrative Assistant position, and whether Dunham was hired through Selux's usual hiring process. *See id.* at 15-16. None of this matters because it does not affect whether Plaintiff's position was eliminated in January 2018. *See LaFever v. Clarke*, 525 F. Supp. 3d 305, 318 (N.D.N.Y. 2021) (quotation omitted) ("An issue of fact is material for purposes of this inquiry if it 'might affect the outcome of the suit under the governing law'").

The record evidence is undisputed insofar as it demonstrates that Seckler, who Plaintiff reported directly to, was fired. *See* Dkt. No. 60-2 at ¶ 37; Dkt. No. 64 at ¶ 37; Dkt No. 60-4 at 40-41, 45, 90. Because Seckler was fired, Plaintiff's position as Seckler's Executive Assistant was unnecessary. *See* Dkt. No. 60-4 at 90; Dkt. No. 60-5 at 78; Dkt. No. 60-7 at 22; Dkt. No. 60-8 at 26; Dkt. No. 60-9 at 21. Plaintiff did also assist Kinder during the time that she reported directly to Seckler. *See* Dkt. No. 60-4 at 92, 94; Dkt. No. 60-5 at 33; Dkt. No. 60-2 at ¶ 30. Following Seckler's termination, Stanway tried to see if there was another available position that Plaintiff could fill. *See* Dkt. No. 60-5 at 45-46; Dkt. No. 60-2 at ¶ 41. At the time Plaintiff was

terminated, the Engineering Department did not need her, and even if it did, Kinder did not want to work with her because of her attitude toward other employees.  *See* Dkt. No. 60-8 at 26-27. Instead of hiring a new Vice President of Manufacturing, Selux gave the job to Shaffer.  *See* Dkt. No. 60-2 at ¶ 38.  Shaffer already had an assistant; therefore, Plaintiff was not needed to support Shaffer.  *See id.* at ¶ 39.  Based on these considerations, Selux terminated Plaintiff.  *See* Dkt. No. 60-4 at 90; Dkt. No. 60-5 at 78; Dkt. No. 60-7 at 22; Dkt. No. 60-8 at 26; Dkt. No. 60-9 at 21. Months later, the needs of the Engineering Department increased and Kinder stated that he could use additional help.  *See* Dkt. No. 60-2 at ¶ 71; Dkt. No. 60-8 at 25-26.  Selux placed Dunham in the role to provide greater assistance to the Engineering and Safety Departments.  *See* Dkt. No. 60-2 at ¶ 74; Dkt. No. 64 at ¶ 74.

Plaintiff does not disagree with any of this.  Throughout Plaintiff's response in opposition to Defendants' statement of material facts, she makes various denials.  However, she does not actually deny the facts.  Rather, she asserts, without support, that Kinder did not like Plaintiff because she was Asian, and that Seckler's position was not "eliminated" because Shaffer assumed Seckler's job responsibilities.  Dkt. No. 64 at ¶ 38.  Plaintiff specifically testified that at the point that Seckler was terminated, "[t]here was no longer a vice president of manufacturing.  There was just a director of engineering at that point."  Dkt. No. 60-4 at 97.  She noted that Shaffer moved into Seckler's position and Shaffer already had an executive assistant.  *See id.*

When asked why she believed that Defendants had a "plan" to replace her with Dunham, she stated: "I don't have evidence.  It was just conversations I had with [Rivera] in passing and I knew how [Kinder] was with me and I believe he had a say with Janine being his assistant."  Dkt. No. 60-4 at 106.  She testified that "while I was still employed with Selux, I would work closely with [Rivera] and the other executive assistants.  And in passing, [Rivera] told me that she is

working on getting [Dunham] to work for [Kinder]." *Id.* at 96.  Plaintiff explained that she

"looked at [Rivera] and I said, 'Why does he need an assistant?  I'm -- I'm in this role.'  And she

just kind of -- she laughed it off giggly the way she usually is, very happy mode and she just

walked away and went into [Kinder's] office and closed the door." *Id.*  Plaintiff states that

"[w]hen [Rivera] said that, I was kind of like, why do we need another assistant, or, you know, it

didn't dawn on me that she was trying to replace me with [Dunham], the way she made it sound

that day, that she said that in passing." *Id.*  There is absolutely no evidence in the record besides

Plaintiff's testimony that supports this contention, nor does this testimony negate the fact that

Plaintiff's job was rendered superfluous because her boss was terminated and the person filling in

for the position already had an assistant.

      Even if there is a dispute as to the veracity of Defendants' contention that Plaintiff's

position was "eliminated," there is no evidence presented that Defendants had an intent to commit

fraud.  "'Intent to defraud can be generally shown by evidence of guilty knowledge or willful

ignorance.'" *Rojas v. Cigna Health & Life Ins. Co.*, No. 14-CV-6368, 2018 WL 4759775, *9

(S.D.N.Y. Sept. 29, 2018) (quoting M&*T Mortg. Corp. v. White*, 736 F. Supp. 2d 538, 565

(E.D.N.Y. 2010)).  "Courts routinely allow parties to rely on circumstantial evidence and

legitimate inferences therefrom to meet this burden, as there is usually no direct evidence of

fraudulent intent." *Id.* (citing *Century Pac.*, 528 F. Supp. 2d at 222-23).  "[T]he 'strong inference

of fraudulent intent' may be shown by evidence of a defendant's 'motive and opportunity to

commit fraud' or 'conscious misbehavior or recklessness.'" *Id.* (quoting *Lerner v. Fleet Bank,

N.A.*, 459 F.3d 273, 290-91 (2d Cir. 2006)); *see also Elliot v. Nelson*, 301 F. Supp. 2d 284, 287

(S.D.N.Y. 2004) (quotations omitted) (alterations in original) ("Even if the parties dispute

material facts, summary judgment will be granted unless the dispute is 'genuine.' . . .  'The mere

existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]'").

Plaintiff's only evidence is her own testimony in which she states that prior to her termination, Rivera would laugh and walk away from her when Plaintiff asked about Dunham. *See* Dkt. No. 60-4 at 96, 106, 119.  Plaintiff does not provide any evidentiary support concerning these alleged conversations, nor does she provide any further details about when the conversations allegedly took place.  *See id.* at 105-06.  This is insufficient to draw a reasonable inference that Defendants intended to defraud Plaintiff.  *See Hernandez*, 2021 WL 1402257, at *9; *see also Bricklayers & Allied Craftworkers Loc. 2 v. C.G. Yantch, Inc.*, 316 F. Supp. 2d 130, 141 (N.D.N.Y. 2003) (quotation omitted) ("[T]he nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts'").

Every party unequivocally testified in their deposition that when Plaintiff was terminated, it was because there was no position available for her.  *See* Dkt. No. 60-5 at 78; Dkt. No. 60-7 at 22; Dkt. No. 60-8 at 26; Dkt. No. 60-9 at 21.  Even Plaintiff stated that there "was no longer a vice president of manufacturing.  There was just director of engineering at that point."  Dkt. No. 60-4 at 97.

To be sure, Stanway testified that Seckler's "position effectively was eliminated because it was Brenda Shaffer who took over the position, but, in addition to her existing duties.  I'm describing it as a full-time position of Vice President of Manufacturing was restructured, is a better way to put it."  Dkt. No. 60-5 at 32.  He later confirmed that Plaintiff was laid off because there "was no longer a position available for her."  *Id.* at 41.  He explained that "Gloree Sapio was the executive assistant to Mike Seckler.  She was performing, she was supporting the person in

34

terms of their diaries, their meetings, and everything that went on with supporting a vice president." *Id.* at 44. "When the vice president was no longer there Brenda Shaffer took over the functions of that vice president and she already had her support person planning her diary, her person planning her meetings. She had that person in an executive assistant, Kristen deBree." *Id.* at 45. He further noted that Dunham was hired because "[t]he workload would have been the changing factor. January is a lean period. Our business starts the year slow, and I'm assuming by April this is where we've got Brenda Shaffer. She's moved into the role of interim head of manufacturing." *Id.* at 85. Seckler explained that Shaffer was "needing greater levels of support and service from the engineering team, [Kinder's] team, so to facilitate that we've made the decision to make sure that [Kinder] has an assistant to help with the workload at the time." *Id.* He emphasized, "that position was not available in January and as a result of the changes, [Shaffer] heading up manufacturing, a lot of pressure on [Kinder] in the form of documentation to [Shaffer] to service manufacturing an assistant position to [Kinder] was created." *Id.* at 85-86. Stanway explained that he recreated the Vice President of Manufacturing position in January of 2022, but up until that time, the role was filled by Brenda Shaffer. *See id.* at 75.

This is confirmed by the employee organization charts which reflect that in 2017, Mike Seckler and Brenda Shaffer were both Vice Presidents and Shaffer was assisted by Kristen deBree and Seckler was assisted by Plaintiff. *See* Dkt. No. 60-17. Then, the 2018 organization chart demonstrates that Brenda Shaffer filled two boxes on the chart: the one that she previously filled and the box where Seckler was previously listed. *See* Dkt. No. 60-18. She was named as "Vice President" for the former and "Vice President Interim" for the latter. *Id.* Kristen deBree was listed as Shaffer's Executive Assistant and Plaintiff was no longer on the chart. *See id.*

Thus, even viewing all of the evidence in Plaintiff's favor, she has not presented evidence sufficient to raise a genuine dispute as to whether Defendants made a false representation and intended to commit fraud. *See 789 Ninth & 414 E. 74th Assocs. LLC v. Hundalani*, No. 21-CV-5314, 2023 WL 4472162, *4 (S.D.N.Y. July 11, 2023) ("[S]elf-serving declarations, not supported by evidence, are generally not sufficient to create an issue of material fact") (citing *Dreni v. PrinterOn Am. Corp.*, No. 18-CV-12017, 2021 WL 4066635, *13 (S.D.N.Y. Sept. 3, 2021) (finding that plaintiff's "self-serving deposition testimony and declaration are completely unsupported by the record and therefore cannot create a genuine issue of material fact"); *Deebs v. Alstom Transp., Inc.*, 346 Fed. Appx. 654, 656 (2d Cir. 2009) (finding that self-serving deposition testimony without "hard evidence adduced during discovery . . . is insufficient to defeat summary judgment")). Accordingly, because there is no evidence of fraud, Plaintiff knowingly and voluntarily signed the unambiguous Separation Agreement, and the release clearly covers Plaintiff's claims, Defendants' motion for summary judgment is granted on this ground. Alternatively, Defendants are entitled to summary judgment on Plaintiff's discrimination claims.

**C.    Discrimination**

"In 1973, the Supreme Court adopted a three-stage, burden-shifting framework for analyzing employment discrimination cases under Title VII where a plaintiff alleges disparate treatment but does not have direct evidence of discrimination." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 82 (2d Cir. 2015) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973)). "Under the test, a plaintiff must first establish a *prima facie* case of discrimination by showing that: '(1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination.'" *Id.* at 83 (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33,

42 (2d Cir. 2000)).  "Most of the core substantive standards that apply to claims of discriminatory

conduct in violation of Title VII are also applicable to claims of discrimination in employment in

violation of § 1981. . . ."  *Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 225 (2d Cir. 2004).

"'Section 1981 prohibits race-based discrimination in the creation and enforcement of contracts.'"

*Butler v. Hesch*, 286 F. Supp. 3d 337, 364 (N.D.N.Y. 2018) (quoting *McKnight v. Middleton*, 699

F. Supp. 2d 507, 529 (E.D.N.Y. 2010)); *see also Walsh v. New York City Hous. Auth.*, 828 F.3d

70, 75 (2d Cir. 2016) (quoting *Liebowitz v. Cornell Univ.*, 584 F.3d 487, 498 (2d Cir. 2009)).

   "'The burden of establishing a prima facie case is not onerous, and has been frequently

described as minimal.'"  *Walsh*, 828 F.3d at 75 (quoting *Norton v. Sam's Club*, 145 F.3d 114, 118

(2d Cir. 1998)).  "If the plaintiff successfully establishes a *prima facie* case, 'the burden then must

shift to the employer to articulate some legitimate, nondiscriminatory reason for the adverse

employment action.'"  *Id.* (quoting *United States v. Brennan*, 650 F.3d 65, 93 (2d. Cir. 2011)).  "If

the employer carries that burden, 'the plaintiff's admissible evidence must show circumstances

that would be sufficient to permit a rational finder of fact to infer that the defendant's employment

decision was more likely than not based in whole or in part on discrimination.'"  *Id.* (quoting

*Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004)).

   "[D]etermining 'whether the circumstances "give rise to an inference" of discrimination,

must be a determination of whether the proffered admissible evidence shows circumstances that

would be sufficient to permit a rational finder of fact to infer a discriminatory motive.'"  *Khan v.*

*Bank of Am., N.A.*, 572 F. Supp. 2d 278, 291 (N.D.N.Y. 2008), *aff'd*, 372 Fed. Appx. 216 (2d Cir.

2010) (quoting *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 38 (2d Cir. 1994)).  "A

plaintiff may show disparate treatment to raise an inference of discrimination, which occurs when

'the employer treat[s] plaintiff "less favorably than a similarly situated employee outside his

protected group."'" *Id.* (quoting *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003)). "A plaintiff 'must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself.'" *Id.* (quotation omitted). "For an employee to be similarly situated in all material respects, 'those employees must have a situation sufficiently similar to plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination.'" *Id.* (quoting *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53-54 (2d Cir. 2001)).

Plaintiff contends: "(1) Janine Dunham, who is Caucasian allegedly replaced her; (2) Claus Kinder told Plaintiff in 2011 that he owned 'Nazi Plates'; (3) Selux is a German company that only employs or hires Caucasian employees." Dkt. No. 65 at 18. Plaintiff states that "[w]hile these allegations are undeniable, after discovery, there has been more evidence showing that Dunham was not qualified for the position; that Plaintiff's position was not eliminated but bestowed to [Dunham]." Dkt. No. 65 at 18. Plaintiff claims "that Janine benefited of what it is called 'White privilege.' [Dunham] did not go through the hiring process like any other candidates to a position at Selux, thereby breaching company's hiring policy. Defendants already knew that Janine was losing her position, even before Plaintiff was terminated. Janine was in training when Plaintiff's position was eliminated." *Id.* at 19. Plaintiff testified that "while I was still employed with Selux, I would work closely with [Rivera] and the other executive assistants. And in passing, [Rivera] told me that she is working on getting [Dunham] to work for [Kinder]." Dkt. No. 60-4 at 96. Rivera testified that Dunham had a training period but did not state when it was, and Dunham testified that she did not start training for the position prior to starting in the spring of 2018. *See* Dkt. No. 60-9 at 26-27; Dkt. No. 60-6 at 13-14.

When asked why she believed she was discriminated against, Plaintiff stated, "[j]ust prior history with [Kinder].  He – I worked with him directly in the same office for almost a year and his style and his demeanor and the way he would speak to me was just – I questioned a lot of his professionalism."  Dkt. No. 60-4 at 108.  She expanded, stating that "I would -- I know I would be able to work with different personalities.  And the impression that I got from [Kinder] was that he -- it wasn't mutual.  It wasn't professional.  It was more of like 'I'm going to tender my resignation. I'm not even going to speak to you about it, even though we share the same office.  I'm not even going to tell you anything about it and leave you here while I go on to another competitor company.'  I thought it was very -- without saying words, it was just disrespectful." *Id.*  She also stated that her termination was based on her race because Selux is "a German company.  Most of the front office are all Caucasian or German descent.  And because I work for manufacturing and engineering, which is the end of the office, it wasn't -- you know, it was fine that I wasn't visible. *Id.* at 114-15.  Plaintiff testified that she was "trying to recall conversations that pertain to me being Asian, me being submissive.  The manufacturing floor, they speak a different language than the front office.  The front office is professional, white collar.  The manufacturing floor is blue collar and anything goes." *Id.* at 116.  She stated, "I would hear a lot of different comments about me, some to the extent where I would just remind myself that it's the back end, it's the manufacturing floor, it's guys, you know, they're just gonna talk and say things and don't take it personally." *Id.*  The following exchange between Defendants' counsel and Plaintiff concerned Plaintiff's contentions:

> A. But to be honest with you, it was -- I think there were a lot of comments made about my race, about how I looked, about how I presented myself, which I don't understand why, just me standing there, I have, like it was a problem.  It was very uncomfortable.

Q. Were any of those comments directed at you by Peter Stanway?

A. Peter was in the front office.

Q. So is that a no?

A. No.

Q. What about Mike Seckler, did he ever make any comments to you about being Asian or being anything that you would consider to be discriminatory?

A. No, he was -- no.

Q. Did Claus Kinder ever make any comments to you about being Asian or anything discriminatory?

A. He wouldn't do it on paper.

Q. Okay. Or verbally?  Did he ever say anything verbally to you?

A. Just the -- just like these little comments about he had official plates from the Nazi times and I was kind of like, how do you -- what do you talk about after this?  You know, I am not of German descent.  I'm not Caucasian, but here you are sharing this information with me.  So I didn't know how to take it.

Q. Okay.  So nothing discriminatory that you can recall Ed Wolf ever saying to you?

A. Not that I can recall at this time.

Q. And what about Yvonne Rivera, did she ever say anything to you that you felt was discriminatory or –

A. I would -- whenever I would question her about Janine, she would kind of just walk away.  It was as if she was caught in telling me something confidential and then she's like, "Oh," and she would walk away.

 Q. But did she ever say anything to you that you felt was discriminatory based upon the fact that you're Asian?

A. Well, I did mention to her, I said, "Is it because I'm Asian that
Claus doesn't want me?"  And she just kind of giggled and walked
away.

*Id.* at 116-19.

Plaintiff testified that she thought Kinder did not like her because she was Asian.  *See* Dkt.
No. 60-4 at 30.  There is no evidence in the record to support that contention.  Plaintiff does not
allege a single specific statement, made by anyone who worked for Selux, related to her being
Asian or from the Philippines.  Plaintiff argues that "[i]f the engineering department got so busy,
they should have hired an experienced administrative assistant, and not someone who needed
training, and was not qualified for the position."  Dkt. No. 65 at 24.  Even if that would have been
a logical solution to Defendants' staffing needs, that does not equate to racial discrimination.

To be sure, "[i]t is well-settled . . . that 'the mere fact that a plaintiff was replaced by
someone outside the protected class will suffice' to establish the required inference of
discrimination at the prima facie stage."  *Dabney v. Christmas Tree Shops*, 958 F. Supp. 2d 439,
451-52 (S.D.N.Y. 2013), *aff'd sub nom. Dabney v. Bed Bath & Beyond*, 588 Fed. Appx. 15 (2d
Cir. 2014) (quoting *Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 381 (2d Cir.
2001)); *see also Littlejohn v. City of New York*, 795 F.3d 297, 312-13 (2d Cir. 2015) ("[A]n
inference of discrimination also arises when an employer replaces a terminated or demoted
employee with an individual outside the employee's protected class").  However, courts have
concluded that even where a plaintiff was replaced by a person outside the protected class, a
discrimination claim cannot proceed where there were legitimate, nondiscriminatory reason for
terminating the plaintiff.  *See id.* (citing *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1117 (7th Cir.
1992); *Jones v. Gov't Emps. Ins. Co.*, No. 04-CV-3492, 2006 WL 1229136, at *8 (E.D.N.Y. May
8, 2006); *Farina v. Branford Bd. of Educ.*, No. 09-CV-49, 2010 WL 3829160, at *6 (D.Conn.

Sept. 23, 2010), *aff'd*, 458 Fed. Appx. 13 (2d Cir. 2011); *O'Sullivan v. N.Y. Times*, 37 F. Supp. 2d 307, 319 (S.D.N.Y. 1999)).

There is a dispute of fact as to whether Plaintiff was "replaced" by Dunham. Defendants argue that Plaintiff was not replaced because the positions held by Dunham and Plaintiff were different and Dunham did not fill the new position until months after Plaintiff was terminated. *See Gray v. Lutheran Soc. Servs. of Metro. New York, Inc.*, No. 04-CV-2843, 2006 WL 1982859, *6 (E.D.N.Y. July 13, 2006) ("[A]lthough plaintiff was replaced by a non-African American, only a very weak inference may be drawn because that replacement was first hired as a volunteer. More specifically, because Valez was hired as an unpaid volunteer, plaintiff's evidence that the cook position was re-filled soon after plaintiff's termination does not undermine defendant's non-discriminatory reason for plaintiff's termination-that defendant no longer had funding for the position. Valez did not replace plaintiff as a paid employee until March 1, 2004, approximately seven months after plaintiff's termination"); *see also Blanke v. Rochester Tel. Corp.*, 36 F. Supp. 2d 589, 597 (W.D.N.Y. 1999). Plaintiff argues that she was replaced by Dunham as demonstrated by Rivera's commentary on an intention to get Dunham to work for Kinder before Plaintiff was terminated. *See* Dkt. No. 65 at 21-22.

Summary judgment in Defendants' favor is appropriate because Defendants offered legitimate, non-discriminatory reasons for Plaintiff's termination. It is undisputed that Plaintiff's direct supervisor was fired, the position was not refilled, and the supervisor who took over the role already had an assistant; thus, Plaintiff's position was eliminated, and she was terminated as a result. *See Blanke*, 36 F. Supp. 2d at 598 ("Replacement by a person of a different race may suffice to make out the fourth element of a prima facie case under Title VII, but without additional evidence of discriminatory intent, it is insufficient at the summary judgment stage. . . .

In any business, vacancies will arise from time to time as employees retire, resign, or get promoted or transferred").

When the burden shifts to a defendant to proffer legitimate, nondiscriminatory reasons for the conduct at issue, "'[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons. . . .  It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it [discriminated] against the plaintiff.'"  *Winslow v. Pulaski Acad.*, 448 F. Supp. 3d 197, 213-14 (N.D.N.Y. 2020) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981)).  "According to the Supreme Court, '[t]o accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the [employment decision]. . . . The explanation provided must be legally sufficient to justify a judgment for the defendant.'"  *Id.* (quotation omitted).  "The Court also noted that '[a]n articulation not admitted into evidence will not suffice.  Thus, the defendant cannot meet its burden merely through an answer to the complaint or by argument of counsel.'"  *Id.* (quotation omitted).

"If the employer articulates such a reason, the burden shifts back to the plaintiff to show that the employer's 'stated reason for [the adverse employment action] was in fact pretext' for discrimination."  *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 270-71 (2d Cir. 2023) (quoting *United States v. Brennan*, 650 F.3d 65, 93 (2d Cir. 2011); citing *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000)).  "A plaintiff can prove pretext by 'demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action.'"  *Albertin v. Nathan Littauer Hosp. & Nursing Home*, 537 F. Supp. 3d 243, 269 (N.D.N.Y. 2021) (quoting *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013)).  "But any weaknesses and implausibilities a plaintiff can show are 'simply one form of circumstantial evidence that is probative of intentional discrimination[.]'"  *Id.* (quoting

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000)). "A plaintiff's prima facie case itself may provide evidence of intentional discrimination as well." *Id.* (citation omitted).

Defendants' have provided a nondiscriminatory reason for Plaintiff's termination: her job was eliminated. Every person, including Plaintiff, acknowledged in their deposition that Seckler's position was eliminated and the person to fill-in for Seckler, Shaffer, had her own assistant. Thus, Plaintiff's position no longer existed. *See* Dkt. No. 60-4 at 90; Dkt. No. 60-5 at 78; Dkt. No. 60-7 at 22; Dkt. No. 60-8 at 26; Dkt. No. 60-9 at 21. Defendants also explained that even if Plaintiff was qualified and could have been brought back to re-fill the position, Defendants did not do so because of the problems with Plaintiff's attitude toward other employees. *See* Dkt. No. 60-8 at 27; *cf. Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 136 (2d Cir. 2000) ("In spite of the company's purported need to downsize, Oravets, who was 25 years younger than the plaintiff, was hired to fill [the] position as director of marketing only three months after plaintiff was discharged, tending to refute the reduction-in-force reason for plaintiff's discharge. . . . Although [the defendant] asserts that a newly acquired account warranted the hiring of another employee, its contention does not explain why [the defendant] did not consider rehiring [him] for the position"). Based on this evidence of legitimate, non-discriminatory reasons for Defendants' conduct, the burden shifts back to Plaintiff to prove that this reason was pre-textual.

Plaintiff acknowledges that she has the burden to prove that discrimination "was the real reason for the employment action." Dkt. No. 65 at 21. She does not, however, present any evidence supportive of the proposition that Defendants' proffered reasons are pretextual. Plaintiff argues that she testified that Kinder told her about "Nazi plates," but Kinder denies it and this alleged statement was made in 2011. *Id.* at 20. Plaintiff also notes that "the higher level, all employees such as CEO, vice-presidents were all Caucasians." *Id.*

44

There is no evidence in the record that Plaintiff's race had any casual relation to her termination.  Even if the Court were to credit Plaintiff's allegations entirely, that Kinder talked to her about Nazi plates in 2011 and all of the higher-level employees were white, there is zero evidence in the record to connect those circumstances to Plaintiff's termination.  Thus, Plaintiff has not raised a dispute of fact as to whether Defendants' proffered reason was pretextual.

As to Plaintiff's New York State Human Rights Law claim, prior to 2019, "[t]he standards for recovery under the New York State Human Rights Law . . . [were] the same as the federal standards under [T]itle VII of the Civil Rights Act of 1964." *Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295, 305 n.3 (2004); *see also Reed v. A.W. Lawrence & Co., Inc.*, 95 F.3d 1170, 1177 (2d Cir. 1996).  "In 2019, however, the NYSHRL was amended. . . .  While New York courts have not yet produced any substantive analysis of how this amendment changes standards of liability under the NYSHRL, courts in this District have interpreted the amendment as 'render[ing] the standard for claims closer to the standard of the [New York City Human Rights Law].'" *Everett v. New York City Dep't of Educ.*, No. 21-CV-7043, 2023 WL 5629295, *11 (S.D.N.Y. Aug. 31, 2023) (quoting *Livingston v. City of New York*, 563 F. Supp. 3d 201, 232 n.14 (S.D.N.Y. 2021)).  "'Courts must analyze NYCHRL claims separately from any federal law claims and should construe the NYCHRL "liberally for the accomplishment of the uniquely broad and remedial purposes thereof."'" *Id.* (quoting *Bueno v. Eurostars Hotel Co., S.L.*, No. 21-CV-535, 2022 WL 95026, at *8 (S.D.N.Y. Jan. 10, 2022)) (additional quotation omitted).  Under the NYCHRL, "[t]he employer may prevail on summary judgment if it shows that a reasonable jury could conclude only that the conduct amounted to no more than a petty slight." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 111 (2d Cir. 2013) (citing *Williams v. New York City Hous. Auth.*, 61 A.D.3d 62, 80 (1st Dept. 2009)).

"The Court notes that a corporate employee, even if she holds the title of manager or supervisor, is not subject to suit for discrimination under the NYSHRL." *Matthew v. Texas Comptroller of Pub. Accts.*, No. 21-CV-5337, 2022 WL 4626511, *7 n.5 (S.D.N.Y. Sept. 30, 2022) (citations omitted). "To state a claim for aiding and abetting discrimination under the NYSHRL, a plaintiff must allege that the defendant actually participated in the unlawful conduct such that 'the aider and abettor share the intent or purpose of the principal actor.'" *Fellah v. City Univ. of New York*, No. 20-CV-6423, 2022 WL 4619902, *8 (S.D.N.Y. Sept. 30, 2022) (quoting *Rahman v. Limani 51, LLC*, No. 20-CV-6708, 2022 WL 3927814, *7 (S.D.N.Y. Aug. 31, 2022)).

As Rivera and Wolf are not "employers," they cannot be held individually liable under the NYSHRL. Moreover, Plaintiff has presented no evidence that either Rivera or Wolf participated in the decision to terminate Plaintiff or that they discriminated against her because of her race. Rather, they were simply the individuals who communicated the termination decision to Plaintiff. Plaintiff states that Rivera and Wolf " have power to hire and fire employees. Both clearly have power to hire and fire employees, and both fired Plaintiff on the ground that her position was eliminated when in fact, their evil aim was to hire a Caucasian woman for the position and get rid of an employee of Asian descent. Both Wolf and Rivera testified that they had the power to hire and terminate employees. Further they were both present, and told Plaintiff that her position was eliminated when it was not." Dkt. No. 65 at 24.

It is true that Rivera testified that Human Resources would hire and fire employees, and Wolf testified during his depositions that they would sometimes be involved in the hiring or firing of an employee and that they were the ones who informed Plaintiff that she was terminated. *See* Dkt. No. 60-7 at 9, 24-25; Dkt. No. 60-9 at 9, 33-34. However, both stated that they did not make the decision to terminate Plaintiff. *See* Dkt. No. 60-7 at 17; Dkt. No. 60-9 at 20-21. Plaintiff does

not present evidence to the contrary.  Nor does she otherwise present any evidence that Rivera or Wolf encouraged, condoned, or approved of the alleged discriminatory actions.  *See Charles v. City of New York*, No. 21-CV-5567, 2023 WL 2752123, *7 (S.D.N.Y. Mar. 31, 2023).  Even applying the more liberal NYCHRL standards to Plaintiff's NYSHRL, she has not presented any evidence that Kinder's comment about Nazi plates, or Rivera's giggling and walking away was any more than petty slight or that the conduct was an unlawful discriminatory practice.  Based on the foregoing, the Court grants Defendants' motion as to Plaintiff's discrimination claims.

**D.    Breach of Contract**

Defendant Selux filed a counter claim for breach of contract.  *See* Dkt. No. 40.  They move for summary judgment on the claim, asserting that Selux and Plaintiff entered into a valid and binding contract which Plaintiff breached by filing this action.  *See* Dkt. No. 60-1 at 23.  They state that Selux has been damaged through the expense of attorneys' fees in defending this action. *See id.* at 24.  In response, Plaintiff states, "[f]or the sake of brevity, Plaintiff had already addressed this issue in Point I of his opposition.  Defendants have made the same arguments all over again causing Plaintiff to repeat herself."  Dkt. No. 65 at 25.

"To prevail on a breach of contract claim under New York law, a plaintiff must show that '(1) a contract exists; (2) plaintiff performed in accordance with the contract; (3) defendant breached its contractual obligations; and (4) defendant's breach resulted in damages.'"  *Martinez v. Agway Energy Servs., LLC*, 88 F.4th 401, 409 (2d Cir. 2023) (quoting *34-06 73, LLC v. Seneca Ins. Co.*, 39 N.Y.3d 44, 52 (2022)).  "Under New York law, the initial interpretation of a contract is a matter of law for the court to decide and where the contract is unambiguous, a court is required to give effect to the contract as written."  *Espejo v. Cornell Univ.*, 523 F. Supp. 3d 228,

237 (N.D.N.Y. 2021) (quoting *K. Bell & Assocs., Inc. v. Lloyd's Underwriters*, 97 F.3d 632, 637 (2d Cir. 1996) (additional citations and quotation marks omitted)).

Plaintiff does not argue that a single provision in the Separation Agreement is ambiguous. *See* Dkt. No. 65.  Plaintiff does not dispute that Selux performed its obligations under the contract, that she breached the contract by filing this suit, or that Selux was damaged by Plaintiff's breach.  Insofar as Plaintiff argues that the contract should be voided because of Defendants' fraud, the Court has already concluded that there is not sufficient evidence to create a dispute of material fact on that issue.  Rather, the Court's previous conclusions—that Plaintiff knowingly and voluntarily entered into the Agreement and there is no evidence sufficient to create a genuine dispute of material fact as to Plaintiff's allegations of fraud—support the related conclusion that Plaintiff has not raised a dispute of material fact as to Selux's breach of contract claim.  Thus, Defendant Selux's motion on their breach of contract claim is granted.

As far as damages are concerned, "Selux requests an award of liquidated damages equal to $7,246.64 (the amount of the severance less $100.00) as well as an award of reasonable attorneys' fees" and costs.  *See* Dkt. No. 60-1 at 24-25.  The Separation Agreement provides for damages upon breach for "the total amount paid to [the Employee] under paragraph '2' of this Agreement, less one hundred dollars . . . .  Employee also agrees that if she breaches this Agreement, she shall pay to Employer all costs incurred by Employer in a lawsuit or administrative action brought to enforce this agreement and/or in collecting the amounts described herein, including reasonable attorneys' fees, costs, and disbursements."  Dkt. No. 60-12 at 6.  Plaintiff does not respond to Selux's damages request.  *See* Dkt. No. 65.

Defendant Selux brought its counter claim against Plaintiff to enforce the Separation Agreement and because the Court has concluded that Defendant Selux is entitled to summary

judgment on its breach of contract claim, Defendant Selux is entitled to damages.  The Court will reserve further ruling on an award of damages and fees, however, pending briefing from the parties.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions, and the applicable law, the Court hereby

**ORDERS** that Defendants' motion for summary judgment (Dkt. No. 60) is **GRANTED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor; and the Court further

**ORDERS** that this action shall remain open pending a decision on a motion for damages and attorneys' fees; and the Court further

**ORDERS** that Defendant Selux file a motion for damages and attorneys' fees within thirty (30) days of the filing of this Memorandum-Decision and Order to which a response deadline will subsequently be set; and the Court further

**ORDERS** that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated:  March 27, 2024
        Albany, New York

Mae A. D'Agostino
U.S. District Judge

49